Scott **WEYLS, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 06A05–9112–CR–420.

Court of Appeals of Indiana,
Fifth District.

Sept. 1, 1992.

Transfer Denied Oct. 21, 1992.

Ronald L. Lehrman, Lebanon, for appellant-defendant.

Linley E. Pearson, Atty. Gen., Michael Gene Worden, Deputy Atty. Gen., Indianapolis, for appellee-plaintiff.

BARTEAU, Judge.

Scott Weyls appeals his convictions following a jury trial on two counts of robbery, class B felonies, two counts of theft, class D felonies, and one count of vehicle theft, a class D felony. On appeal he raises six issues which we have consolidated and restated as:

1. Whether the trial court erroneously admitted evidence of extrinsic offenses;

2. Whether the evidence is sufficient to support each conviction;

3. Whether the trial court erroneously refused Weyls's tendered instruction on the defense of voluntary intoxication; and

4. Whether the trial court erroneously gave the State's instruction 3 and refused Weyls's tendered instruction 5 on aiding and abetting.

The State brings to our attention an issue not raised by Weyls, but which we must address: Whether the convictions and sentences for the two theft charges (but not the vehicle theft charge) are improper and should merge with the robbery convictions and sentences.

We affirm in part, reverse in part and remand for vacation of the theft convictions.

### FACTS

On the night of January 16, 1991, Weyls and two companions, Gerald Bivins and Ronnie Chambers, were together at Bivins's home in Lafayette. They all left in Bivins's wife's car and went to the Lazarus store in the Tippecanoe Mall. At the Lazarus store, they stole several pairs of jeans and returned to Bivins's home where they divided the jeans among themselves. The three then set out for a Speedway gas station near the Dollar Inn in Lafayette. There, Chambers broke out a window and they waited to see if the police would respond to an alarm. While waiting, Chambers noticed an open door at the Dollar Inn and he and Bivins went to rob the men in the room. Weyls moved into the driver's seat of the car and waited for them to return. Chambers and Bivins returned with two duffel bags containing the items they took from the occupants of the Dollar Inn room. The three then returned to Bivins's home and Weyls and Bivins carried the duffel bags into the house.

Weyls, Bivins and Chambers then proceeded to the Holiday Inn in Lebanon. Weyls waited in the car while Bivins and Chambers went inside. Kevin Hritzkowin, a guest at the Holiday Inn, returned to his room shortly after 11:00 p.m. When he did so, two men with guns accosted him, forced him into his room, tied him up and threatened to kill him. The men put a pillow case over his head and tied him to the handrail in the bathtub. Hritzkowin could hear the men ransacking his room. They took his money, credit cards, keys to his employer's van, and bank card and forced Hritzkowin to tell them his ATM password number. While the room was being ransacked, Hritzkowin heard a third man knock on the door and be admitted to the room. He heard the third man ask what was going on and heard him say "I'll go check out the rest of the hotel." Hritzkowin could not identify Weyls as the third man but did testify that Weyls's voice was similar to the one he had heard. Hritzkowin's company van was discovered missing from the hotel parking lot and was discovered the next day in a parking lot in Lebanon. Several unsuccessful attempts to obtain money with Hritzkowin's bank card at an ATM were made that night.

On their way back to Lafayette, Weyls, Bivins and Chambers stopped at a rest stop along northbound I–65 to use the restroom. Chambers noticed a man with a fat wallet, William Radcliffe, and Chambers and Bivins followed this man back into the restroom. Weyls proceeded to the car. When Bivins and Chambers returned to the car, Bivins told Weyls that someone had died in the restroom. Radcliffe's body was discovered in the restroom and his wallet was missing. Many of the items from his wallet were later discovered in a dumpster behind a grocery store in Rossville and from the landfill where the trash from the dumpster had been taken. One piece of identification was found stuck in a mile marker post on northbound I–65. Weyls, Bivins and Chambers had stopped at this mile marker after leaving the rest stop and had put something in the post.

Weyls was charged with Robbery, Theft, and Vehicle Theft in connection with the events at the Holiday Inn, and with Robbery and Theft in connection with the events at the rest stop. A jury found him guilty on all five counts and the trial judge entered convictions on all counts. Weyls was sentenced to 20 years for the robbery conviction and three years each for the theft convictions stemming from the Holiday Inn occurrence, the sentences to run concurrently, and he was sentenced to 20 years for the robbery conviction and three years for the theft conviction stemming from the rest stop occurrence, the sentences to run concurrently and consecutively to the other sentences.

## EXTRINSIC OFFENSE EVIDENCE

Prior to trial, the trial court granted Weyls's motion in limine prohibiting the State from introducing certain extrinsic offense evidence, specifically: 1) shoplifting at the Lazarus store in Lafayette, 2) possession of property stolen from the Lazarus store, 3) attempted burglary of the Speedway gas station in Lafayette, 4) robbery at the Dollar Inn in Lafayette, and 5) the murder of William Radcliffe. The State was subsequently allowed to introduce this evidence, with the exception of Radcliffe's murder. Weyls's argues that the trial court improperly allowed this testimony contrary to the motion in limine.

■ We first note that granting a motion in limine is not a final reviewable order. *Lagenour v. State* (1978), 268 Ind. 441, 376 N.E.2d 475. The purpose of a motion in limine is "to prevent the proponent of potentially prejudicial matter from displaying it to the jury, making statements about it before the jury, or presenting the matter to a jury in any manner until the trial court has ruled upon its admissibility in the context of the trial itself. *Id.* Prior to attempting to introduce the extrinsic offense evidence covered by the motion in limine in this case, the State properly sought a ruling during the trial on its admissibility. Thus, the purpose for which the motion in limine was obtained was served. Although Weyls frames the issue in terms of the trial court erroneously acting contrary to the motion, the motion in limine is not reviewable upon appeal. *Id.*

Weyls did, however, object to the extrinsic offense evidence when it was admitted at trial and has preserved his issue as to its admissibility. Weyls argues that the evidence of the crimes committed in Lafayette was not properly admissible because the evidence did not fall under one of the exceptions to the general rule that evidence of extrinsic offenses is not admissible.

■ Evidence concerning offenses extrinsic to the one for which a defendant is on trial is generally inadmissible for three reasons: 1) the danger that the jury will convict the defendant because of his general bad character, 2) indiscriminate admission of extrinsic offenses compels a defendant to meet accusations without notice, and 3) extrinsic offenses raise collateral issues that confuse the jury and divert attention away from the charged crimes. *Gibbs v. State* (1989), Ind., 538 N.E.2d 937; *Street v. State* (1991), Ind.App., 567 N.E.2d 1180, *trans. denied.*

■ Several exceptions to this general rule have developed. For a comprehensive discussion of the exceptions, which need not be repeated here, see *Street, supra* at 1184–85. One of the exceptions allows evidence of extrinsic offenses if the evidence tends to prove the existence of a preconceived plan which includes the charged offense. *Gibbs, supra* at 939. Under this "common scheme or plan" exception, the extrinsic offenses must "be so related in character, time and place of commission as to establish some plan which embraced both the prior and subsequent criminal activity and the charged crime." *Id.* at 939 (quoting *Malone v. State* (1982), Ind., 441 N.E.2d 1339, 1347).

At trial, the State urged the trial court to admit the extrinsic offense evidence under this "common scheme or plan" exception. We need not discuss, however, whether the evidence was properly admitted under this exception because we conclude it was properly admitted under another theory and we may affirm a trial court's ruling on admissibility on any theory supported by the record.

■ Quite apart from the rule against the admission of extrinsic offense evidence and the several exceptions thereto, there is another theory under which evidence of uncharged crimes may be admissible. This is the "inseparable crimes" or "res gestae" theory. As is explained in a treatise on Indiana law, Indiana courts use this phrase to describe happenings near the charged crime in time and place, which "complete the story of the crime on trial by proving its immediate context." 12 Miller, Indiana Evidence, § 404.206, at 259 (quoting McCormick, Evidence § 190, at 448 (2d ed. 1972)). Unlike the "common scheme or plan" exception, it is not necessary to es-

tablish a preconceived plan involving both the uncharged and the charged crimes. Res gestae includes crimes committed as part of the same transaction as the crime charged, or as part of an uninterrupted series of events of which the crime charged was a part. *Wilson v. State* (1986), Ind., 491 N.E.2d 537. In precise use, res gestae is not an exception to the general rule, because such evidence is "offered not to show that the defendant has a propensity to act in criminal ways, but to prove and explain the occurrence of a specific, charged crime." *Street, supra* at 1184, n. 6 (quoting *Miller, supra*, at 261). Res gestae does not render otherwise irrelevant evidence admissible. It merely illustrates that the scope of relevant evidence may exceed the limits of the charged act and include other acts which are an inseparable part of the whole crime. *Moore v. State* (1987), Ind., 515 N.E.2d 1099, 1103 (citing IA J. Wigmore, Evidence § 218, at 1883 (Tillers Rev.1983)). Further, the admission of evidence under the res gestae exception is within the sound discretion of the trial court. *Gambill v. State* (1985), Ind., 479 N.E.2d 523.

Indiana courts have given res gestae broad application. Thus, in *Tacy v. State* (1983), Ind., 452 N.E.2d 977, the defendant and a companion went on a three or four day crime spree which included theft of a motorcycle, burglary, theft of property in the residence they burglarized, theft of a truck, vandalism of the truck, and the attempted murder of the arresting officer. Tacy was tried to a jury on the charges of attempted murder and theft (it is not clear from the opinion from which acts the theft charge stemmed) and separately tried to the bench on the burglary charge. Evidence of all the criminal activity was admitted in both trials and the defendant objected that the evidence of the crimes he was not being tried for should not have been admitted.

On appeal, the supreme court held that the extrinsic offense evidence was properly admitted because it served the purpose of completing the story behind the charged offenses as they occurred in a series of transactions over the three or four day crime spree. *Id.* at 981.

Likewise, in *Gambill, supra,* the supreme court held that extrinsic offense evidence was properly admitted in the defendant's trial for murder. The defendant and a companion broke into and stole radios from two cars. They then approached the truck in which the victim was sleeping. The defendant attempted to remove the victim from the truck, but the victim awoke and resisted. The defendant then killed the victim and took his wallet. The evidence of the thefts of the radios was proper because they "involved the same men in an act near in time and place to the incident at issue. These acts were closely connected as part of a crime binge culminating in the homicide at issue." *Id.* at 527.

We conclude that the evidence here of a crime spree carried out by Weyls and his companions over the course of an evening also falls within the scope of the res gestae theory. The trial court did not abuse its discretion in admitting the evidence of the criminal activity for which Weyls was not on trial. That evidence helped complete the story of the robberies and thefts for which Weyls was tried and were part of a series of uninterrupted transactions over the course of the crime spree.

## SUFFICIENCY

Weyls next argues that the evidence is not sufficient to support his convictions. Weyls was charged as an accomplice on all five counts. "A person who knowingly or intentionally aids, induces, or causes another person to commit an offense commits that offense...." Indiana Code 35-41-2-4. Weyls contends that the evidence does not support a finding that he aided, induced or caused the commission of the crimes for which he was charged and that his mere presence at the crimes, without any active participation, cannot make him liable.

■ Weyls is correct that a defendant's mere presence at the scene of a crime is not sufficient to support a conviction based on an accessory theory. *Harris v. State* (1981), Ind., 425 N.E.2d 154. However, presence at the scene may be con-

sidered to determine guilt. Other factors from which the trier of fact may infer the defendant participated in the crime include 1) failure to oppose the crime, 2) companionship with one engaged in the criminal activity, and 3) the course of conduct before, during and after the occurrence of the crime. *Johnson v. State* (1986), Ind., 490 N.E.2d 333; *Harris, supra.* Failure to oppose the crime, or "negative acquiescence," is not alone sufficient to sustain a conviction. Cases involving negative acquiescence and mere presence must each be considered on the basis of the particular facts involved. *Id.*

■ Here, the evidence shows that Weyls accompanied Bivins and Chambers on an extensive crime spree through Tippecanoe and Boone Counties. He took a share of the property stolen from the Lazarus store in Lafayette, he assisted in the Days Inn robbery by moving into the driver's seat in the car while Bivins and Chambers committed the robbery, he assisted Bivins in stashing the property stolen in the Days Inn robbery, and the jury could infer that it was Weyls's voice heard by Hritzkowin as the third man in the Holiday Inn robbery offering to check out the rest of the hotel. From all of this conduct before and after the Holiday Inn robbery and the robbery at the rest stop, the jury could infer that Weyls was not merely present and not giving mere negative acquiescence to the crimes committed. The evidence is sufficient to support Weyls's convictions.

## VOLUNTARY INTOXICATION

■ Weyls next argues that the trial court erroneously refused his tendered instruction on voluntary intoxication. When reviewing a trial court's refusal to give a tendered instruction, we consider whether 1) the instruction correctly states the law, 2) the evidence in the record supports giving the instruction, and 3) the substance of the tendered instruction was covered by other instructions. *Rigsby v. State* (1991), Ind.App., 582 N.E.2d 910.

■ Here, the evidence in the record does not support giving the tendered instruction. An adequate evidentiary basis exists "where the evidence of intoxication, if believed, is such that it could create a reasonable doubt in the mind of a rational trier of fact that the accused entertained the requisite intent. If it could do so the refusal of the instruction is error." *Gibson v. State* (1987), Ind., 516 N.E.2d 31, 32 (quoting *Williams v. State* (1980), 273 Ind. 105, 108–09, 402 N.E.2d 954, 956).

The evidence in the record pertaining to intoxication came from Detective Brown and from Bivins's wife who saw the men briefly during the evening. Bivins's wife stated that the three men had been drinking and were "pretty well drunk." However, the men were not "falling down drunk." Detective Brown testified that either Weyls or Bivins had stated in his statement to police that the men had been drinking. There is a complete absence of evidence in the record that Weyls's possible intoxication was so great as to deprive him of the ability to form the necessary intent. To the contrary, he was able to walk, he was able to sort the goods taken from Lazarus, he was able to climb into the front seat of Bivins's car at the Days Inn, and he was able to "scope out" the Holiday Inn. The trial court did not err in refusing to give Weyls's tendered instruction on voluntary intoxication.

## FAILURE TO OPPOSE

■ Weyls finally argues that the trial court erroneously gave State's instruction 3 and erroneously modified his instruction 5. State's instruction 3 read as follows:

> Mere presence at the scene of the crime is not in itself sufficient to allow an inference of participation; however, such presence may be considered with other evidence in determining guilt. You may infer participation from a person's failure to oppose the crime, companionship with another engaged in the crime, and a course of conduct before and after the offense.

Weyls's tendered instruction 5 read as follows:

In order to find the Defendant guilty of aiding in the commission of a crime, there must be some affirmative conduct, either in the form of acts or words, from which the reasonable inference of a common design or purpose to effect the commission of the crime might be drawn. In order to find the Defendant guilty, you must find that he intended by his own actions to cause or facilitate the commission of the crime by the principal offender. You may consider the Defendant's failure to oppose the commission of a crime only when the Defendant owes a duty to protect the victim of the crime such as a parent owes to a child.

(Emphasis added).

The trial court gave this instruction after deleting the underlined portion. Weyls argues that State's instruction 3 is misleading in the absence of the qualifying language deleted from his instruction 5. We cannot argue with Weyls's premise that failure to oppose the commission of a crime, *standing alone,* is not sufficient to impose criminal liability unless a duty to protect the victim exists. *Pace v. State* (1967), 248 Ind. 146, 224 N.E.2d 312. However, Indiana courts have not held that the *only* time failure to oppose may be considered is when there is a duty to act. Indiana courts have consistently held that failure to oppose may be considered *with other circumstances and conduct of the defendant* to determine whether the defendant "lent his countenance and approval" to the commission of the crime. *Mobley v. State* (1949), 227 Ind. 335, 344, 85 N.E.2d 489, 492; *see also Pace, supra,* 224 N.E.2d at 313; *Harris, supra,* 425 N.E.2d at 155.

The record before us does not support inclusion of the qualifying language tendered by Weyls in his instruction 5. As we discussed in the sufficiency issue, there was evidence that Weyls did not merely fail to oppose commission of the crimes; he took an active role in the events of that night. Consequently, the trial court did not err in striking the last sentence from Weyls's instruction 5.

## DOUBLE JEOPARDY

Finally, we address the double jeopardy issue pointed out by the State. Weyls was convicted for both robbery and theft in connection with the robbery of Hritzkowin and for both robbery and theft in connection with the robbery of Radcliffe. As to each victim, the theft was a lesser included offense of the robbery. *Winfrey v. State* (1989), Ind., 547 N.E.2d 272. Thus, we must reverse the theft convictions for Count III and Count V and we remand for vacation of those two convictions.

In all other respects, the judgment of the trial court is affirmed.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.

SHARPNACK and BUCHANAN, JJ., concur.